MORRIS *v.* IMPERIAL INSURANCE COMPANY LIMITED
OF LONDON, and *vice versa.*

| | |
|---|---|
| 106 | 461 |
| f106 | 473 |
| 106 | 461 |
| d110 | 624 |
| 111 | 489 |
| 106 | 461 |
| 120 | 337 |
| 106 | 461 |
| 127 | 496 |
| L127 | 499 |
| 106 | 461 |
| j130 | 191 |

1. Where to a suit upon a policy of fire-insurance the defense is interposed that at the time the policy was taken out by the insured he was not the owner of the property thereby covered, the burden of satisfactorily establishing this contention rests upon the defendant, notwithstanding it may be incumbent upon the plaintiff, in order to make out a prima facie case, to show that the property in question, alleged to have been destroyed by fire, belonged to him at the time the same was burned.
2. An absolute and unconditional covenant of warranty by the insured, of the truth of certain representations made by him in a written application for insurance, is binding upon him irrespective of the question whether such representations were made in good faith or otherwise.
3. It being a vital issue in the case whether or not the insured had complied with a stipulation in the policy requiring him to keep a set of books clearly and plainly presenting a complete record of the business transacted by him, it was error not to admit in evidence a letter received by the company from his attorney prior to the commencement of suit, which tended to show that at the trial the insured had assumed a position apparently inconsistent with a statement made in this letter as to certain facts material to this issue. Testimony as to the "usualness or unusualness" of a debtor himself keeping no books, but relying on a creditor to do so for him, was, however, properly rejected, not being pertinent to the issue

presented; and the same is true as to an observation by an expert witness, in commenting upon the manner in which the books of the insured were kept, that, though probably going "through fifty sets of books a year," the witness had "never seen anything of that sort before."

4. Though the agent who wrote the policy had at the time full information regarding the method of bookkeeping pursued by the insured, the mere fact that such agent then failed to raise any objection thereto would not amount to a waiver by the company of its right to insist that the insured should comply with his express covenant, entered into when he accepted the policy, to *thereafter* keep such a set of books as was therein specified; nor, under such circumstances, would the company be estopped from setting up the defense that the insured had failed to comply with his covenant, if, upon being called upon to indemnify him for a loss, this fact came to the knowledge of the company.

5. It does not follow that, because evidence introduced in behalf of a plaintiff be strong enough to withstand a motion for a nonsuit, it is not within the power of the trial judge, if dissatisfied with a verdict based upon such evidence, to grant the losing party a new trial. Certainly it is true that a judgment sustaining a motion for a new trial, though based specifically upon a single ground thereof whether meritorious or not, should not be set aside if it affirmatively appears that, for any reason assigned by the movant in other grounds of his motion, it would have been reversible error to overrule the same.

6. Under the facts of the present case, the court was not authorized to give in charge to the jury any instructions whatsoever with regard to the assessment of damages and attorney's fees against the defendant company.

7. The defendant having failed to establish its contention that the insured, in computing his loss, had endeavored to perpetrate a fraud upon the defendant, the trial judge properly refused to submit this defense to the jury. Nor was any error committed in rejecting a memorandum, alleged to have been made by an expert bookkeeper, which was offered by the defendant as "documentary evidence" in support of its contention that the proofs of loss submitted by the insured were unreliable and incorrect.

Argued November 15, 1898.—Decided February 11, 1899.

Action on insurance policy. Before Judge Spence. Sumter superior court. May term, 1898.

*Allen Fort, DuPont Guerry* and *E. A. Hawkins,* for plaintiff.
*Glenn, Slaton & Phillips* and *Hooper & Crisp,* for defendant.

FISH, J. Suit was instituted by Joseph Morris against the Imperial Insurance Company Limited of London, upon a policy of insurance covering his stock of merchandise, which had been wholly destroyed by fire. A verdict was returned in his favor, and the defendant company moved for a new trial, which was granted, the court being of the opinion that as to one branch of the case the finding of the jury was not warranted by the evidence.

The defendant's motion contained various grounds presenting special assignments of error, but each of these was specifically overruled. Neither of the contending parties being satisfied with the direction thus given to the case, the plaintiff brings here his writ of error complaining of the grant of a new trial on the ground upon which the court based its action, whereas the movant, by cross-bill of exceptions, as confidently asserts that error was committed in not sustaining each of the several other grounds upon which it relied. The whole case as made by the defendant's motion is therefore before us for review.

1. Little difficulty has been encountered in disposing of the first question presented for determination. It appears that one of the defenses relied on at the trial was, that the stock of goods destroyed by fire was not, at the date upon which the policy was issued, the property of the plaintiff but really belonged to his brother, Samuel Morris; and accordingly, under the terms of the policy, the plaintiff could not sustain his action. In this connection the court instructed the jury that the burden of proof was upon the company to establish its contention; and this charge is complained of as error, upon the idea that, in order to show individual loss, it necessarily was incumbent upon the plaintiff to prove his ownership of the property insured. It is true that the plaintiff had to successfully meet the burden of making out at least a prima facie case as to every material allegation upon which he relied for a recovery; but it by no means follows that in addition to this burden, common alike to all suitors upon whom rests the onus of establishing their complaints, it was incumbent upon him to go further and negative the several defenses interposed to his action. On the contrary, it is an inflexible rule of practice, that as to all matters purely of defense the burden of proof is cast upon the defendant. The present case offers no reason why any exception should be made to this rule. It was only incumbent upon plaintiff, in order to make out a prima facie case in this respect, to show possession coupled with a bona fide claim of right to the goods in question; for satisfactory proof of these facts would doubtless raise in his behalf a presumption of ownership calling for positive evidence to the contrary on the part of the company. At any rate, in

order to establish his alleged loss or damage by fire, it was not essential that he should do more than prove the goods burned belonged to him at the time of their destruction, i. e. the date of the fire.

2. The written application for insurance upon which the policy sued on was issued contained a covenant on the part of the insured that the statements made by him in reply to the several questions therein propounded concerning the nature of the risk, etc., were true, and were thereby "made the basis and a condition of this insurance, and a warranty on the part of the insured." To the question, "Has any company canceled or refused insurance on the property?" the applicant appears to have answered, "No." On the trial the company sought to show this statement was untrue; and upon the issue thus presented the court charged the jury: "The defendant must not only show that the plaintiff has been refused insurance—his application for insurance has been turned down previously to the issuance of this policy by the company,—but you must be satisfied by the testimony that there was a wilful misrepresentation in the case, and you must find also that the plaintiff understood that he made that warranty." The vice of this charge, as is pointed out by the exception thereto interposed by the company, is that it lays down the rule that the misrepresentation made must be shown to have been wilful, whereas the insured expressly covenanted that his representations as made in his application for insurance should become warranties. It is one thing to stipulate that an insurance policy shall not be binding upon the company in the event the insured has knowingly misrepresented material facts, and quite a different thing, from a legal standpoint at least, to absolutely warrant as true the representations made by him in order to procure the policy. One who, in good faith or otherwise, makes an absolute warranty, does so at his peril; for in the event of a breach thereof the party with whom he contracts is legally entitled to hold him strictly to his covenant. As well might the test laid down by the trial judge be applied to the vendor of goods who sells with an express warranty as to quality, as to the buyer of insurance who gives to a dealer therein a warranty without

which the latter would not sell.    What is said above applies
with equal force to another charge of the court, to which ex-
ception is taken, wherein the jury were instructed that the in-
sured would not be prejudiced by another alleged misrepresenta-
tion in his written application for insurance, concerning the
amount of his sales during the six months prior thereto, unless
they should believe the statement in question was made "know-
ingly and understandingly."    Doubtless the company sought
to elicit and contract with reference to the truth — not vague
or incorrect impressions which the applicant might have as to
the subject-matters of inquiry; and it would seem that if the
latter was not in a position to furnish the character of informa-
tion .desired and insisted upon, he alone should suffer, for he
has expressly agreed with the company that it shall not, if
what he warranted to be true was not in fact so.

3. Apparently the most hotly contested issue in the case was
whether or not the insured had failed to comply with a stipu-
lation in the policy termed the "iron-safe clause," wherein he
covenanted, among other things, to "keep a set of books which
shall clearly and plainly present a complete record of business,
transacted, including all purchases, sales, and shipments, both
for cash and credit;" and "in the event of failure to produce
such set of books . . for the inspection of this company, this
policy shall become null and void, and such failure shall con-
stitute a perpetual bar to any recovery thereon."    There was
evidence on the trial to the effect that he did in fact undertake
to keep a record of his cash sales, but he did not himself at-
tempt to enter in either of two books which he kept in his store
any statement of his purchases.    Testimony was, however, in-
troduced to the effect that the insured was a foreigner, not long
resident in this country and not sufficiently familiar with the
English language or experienced in bookkeeping to undertake
successfully to keep a complete set of books showing all his
business transactions; and accordingly, his brother, who lived
in an adjoining city, agreed to keep for him a complete and ac-
curate statement showing the status of his business.    In pur-
suance of this arrangement, it was further claimed by the insured,
his brother did in fact devote certain pages in his individual

ledger to a record of the business transactions conducted by the insured, showing clearly all purchases of goods made by the latter, as well as the amounts realized from time to time from sales thereof as regularly reported by him. It appears that this brother, Samuel Morris, had formerly been the owner of the business conducted by the insured in the town of De-Soto, but had sold the same on credit to the latter, and had furnished him from time to time with the goods necessary to carry on his business, really backing the enterprise and being his chief creditor. Samuel Morris was carrying on a mercantile business in the city of Americus, and furnished out of his store many of the goods required. In other instances he stood security for goods purchased by the insured from other business houses, paid the bills therefor when due, either out of his own means or with money remitted to him by the insured, and made the proper entry on the ledger, which at all times showed how accounts stood between them. The insured was furnished invoices of all goods purchased by him, as well as receipts for money sent to Samuel Morris, and in this way was kept informed as to the status of the business. These papers were kept on file by the insured in his store, and were burned in the fire which destroyed the premises, so that the sole record of his purchases was that kept by his brother as above indicated.

The insurance company, being skeptical as regards the existence of any such arrangement as that testified to with reference to the keeping of books by the insured, contended that the ledger kept by Samuel Morris itself showed that the real truth of the matter was that he, as any other creditor would have done, merely kept a record of a running account he had with the insured, and in no sense undertook to act as the agent of the latter in the capacity of bookkeeper. In this connection, a letter addressed to the company by the plaintiff's attorney was offered in evidence as having a bearing on the issue to the extent, at least, of tending to show that at the time this communication was written there was no contention that the books of Samuel Morris were anything save a record of his individual business transactions, but on the contrary that it was practically conceded that his ledger merely showed his dealings, as

a creditor, with the insured, who admittedly had had business transactions with other parties as well. This letter, the execution of which was admitted, purported to present to the company an enclosed "claim of loss" made by the insured, with the explanation that: "The reference to pages of ledger upon the detailed statement of the amount of stock has reference to the ledger of S. Morris, from whom he bought most of his goods. Mr. Joseph Morris kept his invoices upon a wire hook in the store, and they were destroyed; but the amounts claimed by him are verified by the books of S. Morris, the Americus Grocery Company, Windsor, Whitley, Hudson & Bro.'s books, and others in Americus with whom he dealt." We can not agree with the trial judge that this letter was irrelevant, upon which idea it was excluded. Indeed, it appears to be peculiarly pertinent as tending to show a possible "change of front" by the insured as evidenced by his contentions at the trial. At any rate, we think the document should have been allowed to go before the jury for what it was worth.

Complaint is made by the company that the court improperly excluded other evidence bearing upon this branch of the case. One of its witnesses, John C. Ruse, an "expert bookkeeper who was testifying in reference to the books of the plaintiff," was not permitted to answer the question: "What about the usualness or unusualness of a creditor keeping books for the debtor, and no books kept by the debtor?" We are not informed what answer to this question the defendant expected to elicit, so can not say the ruling complained of was accompanied with injury; but were this otherwise, we would be constrained to hold the question was improper, as it sought to obtain information having not the remotest relevancy to the issue. The question for determination was, as we understand it, whether or not the insured had kept, either in person or by an agent, such books as were called for by the policy. A question assuming the negative and calling for the expression of an opinion concerning the "usualness" of such a state of affairs might be calculated to bring out instructive and interesting information, but not relevant evidence. Nor do we think the court committed error in ruling out an answer of this witness in which

he asserted, commenting upon the peculiarity of the books kept by the insured, that though he (the witness) probably went "through fifty sets of books a year," he had "never seen anything of that sort before." What this witness had or had not seen in the respect he alluded to was wholly immaterial, unless he was as an expert prepared to swear that it was impossible to correctly keep books under the system adopted by the insured.

. 4. The plaintiff sought further to meet and overcome the defense last above referred to, by an attempt to prove that the company had waived all right to insist upon a strict compliance with the terms of the policy in regard to the keeping of a full and complete set of books. To this end testimony was introduced in his behalf to the effect that, though the agent who wrote the policy well knew the character of records which the insured had been making of his business dealings, no objection to this system was urged, but the agent apparently elected to issue the policy notwithstanding the fact that the point might be raised that the set of books kept by the insured did not present a satisfactory record of his business transactions. Touching this matter the court instructed the jury as follows: "It is contended by the plaintiff [that the defendant company issued to him the policy sued on] with full knowledge on the part of their agent who wrote the policy of the character of the books that the plaintiff was keeping. I charge you, gentlemen, if you believe that, if you believe from the evidence in this case that the agent of the Imperial Insurance Company was invited to examine the books of Joseph Morris before they wrote this policy, did examine them, and had notice of the character of records he was keeping, the books that he was keeping, they would be bound by it, they would be estopped from now setting up this as a defense, and you ought not to sustain that defense in that case. If you believe that they had notice of the kind of books he kept, whether it was in strict compliance with the express terms of that policy or not, if they accepted his money, wrote the policy and accepted the premium with full knowledge of the character of books he was keeping, they could not afterwards come up and set up as a defense that he had failed to comply with the stipulation of the policy about

keeping books." To this charge the defendant excepts upon various grounds, one of the assignments of error urged thereto being that the doctrine of estoppel was not applicable under the circumstances stated. We think this position is well taken. Suppose the insured prior to the issuance of the policy kept no books whatsoever, could it be said that, merely because the company's agent knew this fact, the insured was under no duty of fulfilling the express obligation, assumed by him when he accepted the policy, of *thereafter* keeping a set of books such as is therein specified? Certainly not, for the stipulation in question calls for compliance with this requirement in the *future*, without regard to how he may have conducted his business in the past. In the present case, not only was the agent under no duty, legal or moral, of objecting to the manner in which the insured had previously seen fit to keep a record of his business, but such a course was wholly unwarranted. His conduct could not have misled the insured, for the policy delivered to the latter plainly stated what the company required of him as to keeping a record of his business in the future. It would be idle to say the company "waived" anything. It had no right to object to the method pursued by the insured previously; and until a right on its part subsequently arose to object to the manner in which he kept his books, no waiver could logically be made. So far as the record before us discloses, the company has never made such a waiver. On the contrary, from the defense interposed, it has no intention of releasing the plaintiff from his obligation to comply with his express covenant.

5. When this case was here at the October term, 1897, it was held that: "It being, under the evidence, an issuable question of fact whether or not the plaintiff below sufficiently complied with that stipulation in the policy of insurance sued upon requiring him to 'keep a set of books which shall clearly and plainly present a complete record of business transacted, including all purchases, sales and shipments, both for cash and credit,' and the right of the plaintiff to a recovery depending upon the solution of this question, it was error to grant a nonsuit." 103 *Ga.* 567. The jury, at the trial subsequently had, having found a verdict in his favor, it is contended by counsel

in his behalf that the judgment of the court below granting a new trial, which the judge based solely on the ground that the evidence upon this branch of the case did not warrant the finding of the jury, is directly contrary to the ruling made by this court, as above stated.  We do not think this is necessarily so. The conclusion then reached by us was that, accepting as true the testimony upon which the plaintiff relied, as the trial judge necessarily had to do in passing upon the motion presented, it was error to hold, as matter of law, that the insured had not complied with the terms of the policy. As will have been seen from the statement of facts set forth in the third division of this opinion, the plaintiff relied solely upon parol evidence to sustain his contention that the record of his purchases as made in the books of his brother was kept by the latter, not in the capacity of creditor, but as the accredited agent and book-keeper of the insured.  The insured himself and this brother were the only witnesses introduced to prove this vital contention.  The presiding judge, as is well known, is vested with a very wide discretion in the matter of granting new trials; and if, in his opinion, the witnesses testifying in behalf of the prevailing party be not entitled to credit, it is clearly within the power of the judge, and it may oftentimes be his imperative duty, in a wise exercise of the discretion with which he is clothed, to order that the case undergo another investigation. We are not prepared to say that in the present instance the court abused its discretion.  But be this as it may, it is certainly true that if for any reason presented by the defendant's motion a new trial was properly granted, the judgment of the court below should not be disturbed, whether the ground upon which the judge based his ruling be meritorious or quite the reverse.

6. Aside from the errors above pointed out, which unquestionably were of sufficient gravity to demand the grant of a new trial, we are of the opinion that the court should not have instructed the jury that they were authorized to assess damages and attorney's fees against the defendant company, in the event they should believe it had acted in bad faith and "that there was absolutely no occasion for the defense set up in this case."  This charge is assailed by the defendant upon two dis-

tinct grounds. In the first place, it. is contended that the statute (Civil Code, § 2140) upon which this charge was predicated is violative of the constitution of the United States, in that an attempt is thus made to deprive insurance companies "of property without due process of law," and to deny to them that "equal protection of law" to which they are entitled in common with all other classes of litigants; and in this connection, the case of Gulf, Colorado & Santa Fe Railway Co. *v.* Ellis, 165 U. S. 150, is cited and relied on. Secondly, it is strenuously insisted that "there was no evidence to warrant any charge on the subject of bad faith." Without attempting to deal with the first point made, suffice it to say that we fully agree with counsel that, without regard to whether this statute is or is not unconstitutional, the charge excepted to was unwarranted under the facts disclosed by the record before us. Surely, the defenses relied on by the company can not justly be said to be frivolous, nor obviously without merit. Indeed, counsel for the plaintiff, possibly because of the difficulty experienced in meeting these defenses, seem to concur in this view; for in a supplemental brief filed by them they expressly state that, while they regard the statute as valid, "the finding of damages and attorney's fees is not insisted on," notwithstanding the jury saw proper to include the same in the verdict returned against this company.

7. In regard to that ground of the motion which alleges error on the part of the court in refusing to give in charge to the jury a written request to the effect that if they should "find there was any fraud on the part of the plaintiff, or his authorized agent, in computing the loss," they should find in favor of the company, it need only be said that, in our opinion, the defense set up that in this respect the plaintiff had violated the terms of the policy was not sufficiently made out. Nor is is it necessary to more than briefly deal with the remaining points presented by the defendant's motion for a new trial. What purports to be a mere memorandum of a more or less abstruse and complicated calculation, apparently having no connection with or bearing upon the case on trial, was tendered as "documentary evidence," the "purpose of said evidence be-

ing to show that the amount of the loss sustained under the policies sued on did not equal the face value of the policies, and the character of the business transacted." This document was offered as "a tabulated calculation made by John C. Ruse, an expert accountant, from the proofs of loss." At best, even with this explanation, the paper appears to be no more than an argument in writing intended to show the incorrectness of the plaintiff's claims as set forth in the proofs of loss submitted by him to the company. Not having himself prepared, or having had any connection with the preparation of this paper, it could not be used against him as an admission, nor are we able to perceive upon what other idea it could properly be admitted in evidence.

*Judgment on main bill of exceptions affirmed; on cross-bill reversed. All the Justices concurring.*